[No. 13287. *En Banc.* October 9, 1916.]

PUGET MILL COMPANY *et al., Plaintiffs,* v. THE STATE OF WASHINGTON *et al., Defendants.*[1]

NAVIGABLE WATERS—SHORE LANDS—STATE DEED—TITLE — OUTER BOUNDARY—EXTENSION. An authorized state deed of second-class tide lands vests in the grantees an absolute fee-simple title; and where the outer boundary is undefined except as defined by law as the line of navigability, the grantees take title to such line as it then existed or as it might be moved further out by any act of the state lowering the waters.

SAME—STATE DEED—RESERVATIONS — VALIDITY — CONSTITUTIONAL LAW—OBLIGATION OF CONTRACT. Such title cannot be impaired by any act of the state after making the deeds upon which the title rests; hence attempted reservations to public use designated upon the state's plats above the harbor lines established, except extensions of existing streets running transversely to the shore line, are void.

SAME—SHORE LANDS—STATE DEED—OUTER BOUNDARY—ESTABLISHMENT OF HARBOR AREA. The conveyance of second-class tide lands to private individuals before the establishment of harbor lines in front thereof, is subject to the power of the state to thereafter establish such harbor lines, leaving the outer boundary of the shore land subject to the establishment of harbor lines.

SAME—SHORE LANDS—ESTABLISHMENT OF HARBOR AREA—COMMISSION—POWERS—STATUTES. Where harbor lines in front of second-class tide lands are platted by the commissioner of public lands, pursuant to Rem. 1915 Code, § 8173-2, authorizing him to select and plat the same, and the harbor line commission joined therein by entering its formal order establishing the harbor lines designated on the plats, there was a lawful establishment thereof, notwithstanding article 15 of the constitution, in connection with Rem. 1915 Code, § 6744, seems to contemplate the establishment of harbor lines, within specified limits (not including second-class tide lands) by a

[1]Reported in 160 Pac. 310.

"commission"; as the duty and power prescribed does not constitute a limitation of power upon the legislature touching harbor lines in front of second-class tide lands.

SAME—SHORE LANDS—OUTER BOUNDARY—EXTENSIONS—STREETS— RIGHT TO EXTEND. Where the state's grantees of shore lands became entitled, upon the lowering of the waters by an act of the state, to added shore lands to the line of navigability, the state and municipal authorities representing the public become entitled, on the same principle, to claim the added shore line which is in front of and abutting upon the end of existing streets running transversely and substantially at right angles to the shore line.

SAME—SHORE LINES—HARBOR AREA—SLIPS AND WHARVES—TITLE OF STATE. Upon quieting the title of the state to designated sites for slips and wharves shown on the plat of the harbor area, the title should be quieted only in such slips and wharves and portions thereof as are within the designated harbor areas, and not above the harbor areas.

SAME — SHORE LANDS — ESTABLISHMENT OF OUTER BOUNDARY — "PIERHEAD LINES." In platting harbor areas, the designation of a "pierhead" line alone, upon the state plat, is not the establishing of harbor lines or harbor areas and does not fix the inner harbor line which when established fixes the shore land boundary.

SAME — SHORE LANDS — ESTABLISHMENT OF OUTER BOUNDARY — POWER OF STATE. The state has power to determine, by the establishment of harbor lines, the line of navigability or outer boundary of shore lands dividing harbor area from second-class tide lands sold to private individuals.

Cross-appeals from a judgment of the superior court for King county, Frater, J., entered July 19, 1915, upon findings in favor of the plaintiffs, in consolidated actions to quiet title, tried to the court. Modified on defendants' appeal.

*Oldham & Goodale, Farrell, Kane & Stratton, Walter B. Beals,* and *Hughes, McMicken, Dovell & Ramsey,* for plaintiffs.

*The Attorney General* and *R. E. Campbell, Assistant; France & Helsell, James E. Bradford, Howard Hanson, Alfred H. Lundin, Hugh M. Caldwell,* and *Robert H. Evans,* for defendants.

PARKER, J.—This controversy originated in the commencement of four separate actions in the superior court for King county, which, because of the common interest of the numerous parties in the controlling questions presented, were consolidated, tried and disposed of together in the superior court. The plaintiffs seek a decree quieting their titles to certain lands which they claim as second-class shore lands bordering upon the waters of Lake Washington, as against the claims of the defendants, the state of Washington, city of Seattle, Port District of Seattle, and King county. The superior court granted relief by rendering its decree quieting title in the plaintiffs as prayed for by them, except as to harbor areas established by the state commissioner of public lands and the state harbor line commission and the extensions of streets and roads over the shore land running transversely to the shore line, all as designated upon the state's plats made after the plaintiffs acquired their titles from the state as here claimed by them. The defendants have appealed from the decree in so far as it denies their claims for public use to sites for slips and wharves and roads, streets, boulevards and parkways running longitudinally to the shore line, as designated upon the state's plats. The plaintiffs have also appealed from the decree in so far as it denies their claims to the areas within streets and roads running transversely to the shore line as extensions of existing streets and to the harbor areas, as designated upon the state's plats.

The plaintiffs' claims of title are rested upon deeds of the state made to them or their predecessors in interest, describing the land conveyed as "all shore lands of the second class owned by the state of Washington situated in front of, adjacent to or abutting upon those portions of the United States government meander line lying in front of the following described upland, to wit, . . . to have and to hold said premises with their appurtenances unto the said . . ., successors and assigns forever," leaving the outer boundaries of the lands so conveyed undefined in so far as specific

terms of the deeds are concerned, this being the form of description used by the state in conveying shore lands of the second class, and as authorized by law. These deeds were made by the state in the year 1904. They were all made for a money consideration in pursuance of lawful sale of the lands to the plaintiffs or their predecessors in interest and, as will be noticed, are absolute in form, in so far as the nature of the titles conveyed is concerned. At the time of their execution, the state had not platted any of the shore lands so conveyed, nor had it established any harbor lines or harbor areas in front thereof.

In the year 1914, after the state and national governments had by their action rendered it certain that the Lake Washington canal project would be consummated, resulting in the lowering of the waters of the lake, the state commissioner of public lands caused to be platted the shore lands of the lake, including the lands here involved, designating upon the plats inner and outer harbor lines with harbor areas between in front of portions of the shore lands, and pierhead lines only in front of other portions of the shore lands; and also designating upon the plats above the harbor areas and pierhead lines certain areas or tracts purporting to be reserved and dedicated to public use as sites for slips and wharves and also streets, roads, boulevards and parkways running both longitudinally and transversely to the shore line, some of which transverse roads and streets appear as extensions of roads and streets already established over the original shore lands to the added shore lands. This platting was acquiesced in by the state harbor line commission, which commission, by an order duly made of record, adopted and established the harbor lines and harbor areas as designated upon the plats. In the platting of these shore lands and the establishing of the harbor lines, harbor areas and pierhead lines, the commissioner of public lands and the harbor line commission did so with reference to the shore line and the line of navigability as changed by the lowering of

the waters of the lake in the consummation of the Lake Washington canal project, so that the harbor lines and pierhead lines are located farther out than they would have been had there been no lowering of the waters of the lake. We shall assume, as we proceed, that all of the reservations to public use of tracts and areas as designated upon the plats made by the commissioner of public lands and the harbor line commission, here involved, are from lands which are outside of the shore lands as they existed at the time of the execution of the state's deeds upon which the plaintiffs' rights are rested, before the lowering of the waters of the lake in the prosecution of the Lake Washington canal project.

The problem here presented, so far as the nature of plaintiffs' titles is concerned, is, in substance, the same as that involved in the case of *State v. Sturtevant*, 76 Wash. 158, 135 Pac. 1035, 138 Pac. 650, in the decision of which case we held that the outer boundaries of the granted shore lands had been extended by the lowering of the lake to include the added shore lands, and that the grantees acquired title thereto as if such added shore lands had been then in existence and included in the original grant. This was held to be the law of the state's grantees' shore lands rights in the absence of statute touching the question at the time of the grant, though the state did by statute thereafter so recognize the shore land grantees' titles, attempting, however, to reserve to itself the right to make reservations from the added shore lands for public use in addition to the exercise of its power to establish harbor lines. This was done by the Laws of 1913, ch. 183, page 667, as follows:

"Sec. 1. In every case where the state of Washington has heretofore sold to any purchaser from the state any second class shore lands bordering upon navigable waters of this state by description wherein the water boundary of the land so purchased is not defined, such water boundary shall be held and is hereby declared to be the line of ordinary navigation in such water; and whenever such waters have heretofore been or shall hereafter be lowered by any action done .

or authorized either by the state of Washington or the United
States such water boundary shall thereafter be held and is
hereby declared to be the line of ordinary navigation as the
same shall be found in such waters after such lowering, and
there is hereby granted and confirmed to every such pur-
chaser, his heirs and assigns, all such lands: *Provided, how-
ever,* That this act shall not apply to such portions of such
second class shore lands which shall as hereinafter provided
be selected by the commissioner of public lands of the state
of Washington for harbor areas, slips, docks, wharves, ware-
houses, streets, avenues, parkways and boulevards, alleys, or
other public purposes:   .   .   .

"Sec. 2.    Within twelve months after the taking effect of
this act it shall be the duty of the commissioner of public
lands to survey such second class shore lands and in platting
such survey to designate thereon as selected for public use
all of such shore lands as in the opinion of said commissioner
of public lands is available, convenient or necessary to be
selected for the use of the public as harbor areas and sites
for slips, docks, wharves, warehouses, streets, avenues, park-
ways and boulevards, alleys and other public purposes. Upon
the filing of such plat in the office of the commissioner of
public lands, the title to all harbor area so selected shall re-
main in the state, the title to all selections for streets, ave-
nues and alleys shall vest in any city or town within the cor-
porate limits of which they may be then situate, otherwise in
the county in which situate, the title to and control of any
lands so selected and designated upon such plat for parkway
and boulevard purposes shall, if the same lie outside of the
corporate limits of any city or town and if the same form a
part of the general parkway and boulevard system of a city
of the first class, be in such city, the title to all selections for
commercial waterway district purposes shall vest in the com-
mercial waterway district in which situate, or for which
selected, and the title to all selections for slips, docks,
wharves, warehouses and other public purposes shall vest in
the port district if they be situate in a port district, other-
wise in the county in which situate." Rem. 1915 Code,
§§ 8173-1, 8173-2.

Counsel for the defendants contend that, since the lands
here involved were not shore lands at the time of the execu-

tion of the state's deeds to the plaintiffs and their predecessors in interest, but were then lands under navigable waters of the state, such lands were held by the state not in its proprietary capacity, but in its governmental capacity in trust for the people of the state for the use of navigation and commerce, and for that reason they are not subject to disposition so as to vest absolute title thereto in private parties. While it is not urged that the plaintiffs have acquired no interest in these added shore lands, it is argued that their title thereto is subject to the power of the state to reserve therefrom for public use all reserved areas shown upon the plats above mentioned made by the commissioner of public lands and the harbor line commission above the designated harbor areas and pierhead lines, as well as subject to the power of the state to establish harbor areas and extensions across such added shore lands of existing roads and streets running transversely to the shore line. It seems to us that this contention cannot be sustained in the light of the history of the state's policy since admission to the Union and the decisions of this court. It is true that, by the limitations prescribed by article 15 of our constitution, the state authorities are prohibited from disposing of and vesting in absolute private ownership the lands of the state lying under navigable waters which shall be established as harbor areas; but it is also true that the same article of our constitution provides that the location of such harbor areas along the shores of navigable waters shall be determined and established by a commission appointed for that purpose, thus rendering certain the line dividing shore lands which may be disposed of and vested in absolute private ownership from the lands within harbor areas which cannot be lawfully so disposed of. Now it is no longer an open question in this state as to the nature of the title vested in the grantees of second-class tide and shore lands by deeds from the state absolute in form as these deeds are, upon which are rested the titles of the plaintiffs. The decisions of this court lead

to no other conclusion than that the state authorities have the power to, and when conveying lands of this nature by deeds absolute in form do, vest in the grantees an absolute fee simple title to such lands. *Eisenbach v. Hatfield,* 2 Wash. 236, 26 Pac. 539, 12 L. R. A. 632; *Allen v. Forrest,* 8 Wash. 700, 36 Pac. 971, 24 L. R. A. 606; *Palmer v. Peterson,* 56 Wash. 74, 105 Pac. 179; *State v. Sturtevant, supra; Anderson Steamboat Co. v. King County,* 84 Wash. 375, 146 Pac. 855.

It has also become the settled law of the state by our decision in *State v. Sturtevant, supra,* as we have already noticed, that the grantees of these second-class shore lands, the outer boundary of which remained undefined by the descriptions in the state's deeds except as the law defined such outer boundary as the line of navigability, acquired title out to that line as it then existed or as it might be moved farther out by any act of the state. Concluding an exhaustive review of this question involving one of the same deeds from the state upon which some of the plaintiffs' titles are rested, Justice Chadwick, speaking for the court, at page 173, said:

"We conclude, therefore, on the principal issue, that the Rainier Beach Improvement Company acquired the title to the shore lands conveyed by the state, and that it and its grantees are entitled to follow the line of navigability as it may be finally fixed by or through or in consequence of the act of its grantor, the state."

We conclude, then, that the plaintiffs acquired absolute fee simple title to these added shore lands, as they did to the shore lands existing at the time of the execution of the deeds therefor by the state.

Now this being the nature of the plaintiffs' titles, it is elementary constitutional law that such titles cannot be impaired by any act of the state after making the deeds upon which they rest. This brings us to the question of the outer boundary of the shore lands to which plaintiffs have thus acquired title, which we regard as the controlling question in

this controversy and as quite a different question from that of the nature of the plaintiffs' titles. That is, the fact that the titles so acquired are absolute in fee simple does not determine the question of where, upon the ground, are the outer boundaries of the shore lands so acquired by the plaintiffs. When that question is determined, it will follow that all of the reservations to public use designated upon the state's plats above the harbor lines established by the commissioner of public lands and the harbor line commission, except extensions of existing streets running transversely to the shore line, presently to be noticed, are attempted reservations and dedications to public use of portions of the plaintiffs' shore lands to which they have absolute fee simple title, and are therefore void as against the rights of the plaintiffs.

Had the state established harbor lines in front of these shore lands before they were conveyed by the state to plaintiffs and their predecessors in interest, it is plain that the grantees of such conveyances would have acquired title only to the lands above the harbor lines so established. It seems equally plain to us that the conveyance of shore lands by the state before the establishing of harbor lines in front thereof does not prevent the state from thereafter establishing harbor lines in front of such shore lands, and that the grantees of such shore lands take subject to the power of the state to thereafter establish harbor lines in front thereof. This is foreign to the question of whether a grantee's title to shore lands so acquired is absolute or qualified. . It has to do only with the question of the outer boundaries of the granted shore lands, and that boundary, being by the terms of the grants made before the harbor lines were established, undefined except as the law may define them, we conclude leaves the matter of the outer boundaries of the shore land subject to the establishment of harbor lines by the proper state authorities. Our decision in *State v. Sturtevant, supra,* leads to this conclusion. What the remedy of the owner of the shore lands might be in case of the establishment of har-

bor areas in front of such shore lands in arbitrary and fraud-
ulent disregard of the line of navigability is not involved in
this controversy. We do not want to be understood as hold-
ing that there would be no remedy in such a case.

Some contention is made in the plaintiffs' behalf that there
is no power in the commissioner of public lands or the harbor
line commission to establish the harbor lines here involved.
The argument seems to be that the commissioner of public
lands has no such power because article 15 of the constitu-
tion contemplates the establishment of such lines by "a com-
mission," and that the harbor line commission has no power
to establish these harbor lines because they are not within
or in front of the corporate limits of any city or within two
miles thereof. It is true that article 15 of the constitution,
read in connection with Rem. 1915 Code, § 6744, extending
first-class shore lands two miles beyond city corporate limits,
seems to make it the duty of the legislature to cause harbor
lines within such limits to be established by "a commission."
However, whatever may be the duty and power of the legis-
lature touching the establishment of harbor lines in front of
cities in the light of article 15 of our constitution, we are
of the opinion that the duty and power therein prescribed
does not constitute a limitation of power upon the legisla-
ture touching the establishing of harbor lines in front of
second-class shore lands, that is, lands beyond the limits men-
tioned in article 15 of the constitution, as these lands are.
Rem. 1915 Code, § 6769, confers power upon the harbor line
commission "to lengthen or to extend any such [harbor] areas
now existing or which may hereafter be existing in front of
any city or town;" and § 2 of the act of 1913 (Id., § 8173-2)
above quoted, authorizes the commissioner of public lands to
select and plat harbor areas in front of the second class shore
lands of Lake Washington, including the very lands here in-
volved. That section further provides that "the title to all
harbor area so selected shall remain in the state." It might
well be argued that the action of the commissioner of public

lands alone, in pursuance of this power, would constitute a lawful establishing of these harbor areas. We are, however, quite convinced that when the harbor line commission joined with the commissioner of public lands in the making of these plats and entered its formal order establishing the harbor lines designated thereon, such joint action of the commissioner of public lands and the harbor line commission constituted a lawful establishing thereof. It seems to us quite clear that this was within the power of the legislature to provide for, even though the constitution has made special provision for the establishing of harbor lines in front of cities. We conclude, therefore, that these harbor lines and harbor areas were lawfully established. It is true that the constitution does not in terms prohibit the sale into absolute private ownership of harbor areas other than such areas as are to be established "within or in front of the corporate limits of any city or within one mile thereof;" but plainly a grant of second-class shore lands was never intended to convey land beyond the line of navigability, which line we must assume in this case was properly determined in so far as the harbor lines here involved are concerned.

It is contended in plaintiffs' behalf that the reservations made upon the state's plats of the extensions of existing transverse streets over the added shore lands is as much an invasion of their rights as the reservations upon the state's plats of streets, boulevards and parkways running longitudinally over the added shore lands above the harbor and pierhead lines. As we read the decree of the superior court, it only quiets title to the defendants state and municipal corporations, as representatives of the public, in those extensions of existing roads and streets running transversely to the shore lines which have been dedicated as such by the owners across their shore lands to the added shore lands, limiting such extensions to the width of the dedicated roads and streets where they abut upon the added shore lands. It seems to us that the principle which entitles the plaintiffs,

as owners of the shore lands, to claim the added shore lands because they became a part of the original shore lands, also entitles the defendants, as representing the public, to claim the added shore land which is in front of and abutting upon the end of the existing streets running transversely to the shore line. In other words, the public's right to extend its ownership over the added shore lands is at least as great as that of the private owners of the original shore lands. Since apparently the roads and streets which are here involved and extended transversely across the added shore lands are substantially at right angles to comparatively straight shore lines, we are not here concerned with the question of converging or diverging side lines of shore lands, as might be involved when such lands abut upon a curved shore line.

We note that upon the state's plats, copies of which are here in evidence, there is designated sites for slips and wharves, some of which appear above the established harbor areas and above the designated pierhead lines where there are no designated harbor areas, and some of which appear to be within the established harbor areas. We construe the decree as meaning that the titles of the plaintiffs are quieted as against the claims of the defendants only in those sites for slips and wharves and portions thereof designated upon the state's plats above the designated harbor areas and pierhead lines, and not those designated sites for slips and wharves and portions thereof which are within the designated harbor areas. The decree being in general terms rather than by specific descriptions of each tract as to which title is adjudged to be in plaintiffs or defendants, induces us to here note our construction of its meaning touching the title of the respective parties in these designated sites for slips and wharves, to the end that our decision and the decree may not be construed as awarding to the plaintiffs any title to the harbor areas.

The decree seems by its terms to quiet title in the plaintiffs to all sites for slips, wharves, etc., designated upon the state's plats, unqualifiedly, except such as are designated

within harbor areas. This would seem to include such designated sites and tracts as abut upon designated "pierhead lines" where there are no harbor lines or harbor areas, and be an adjudication against the state touching its power to establish inner harbor lines which might fix the outer boundary of the shore land inside the designated pierhead lines. It seems to us that these, as well as other shore lands in front of which no harbor lines are established, are held subject to the power of the state to establish harbor lines in front thereof, and that the decree should be modified accordingly. The designation of a "pierhead line" alone, upon the state's plats, is not, as we view the law, the establishing of harbor lines or harbor areas. These words may suggest the outer limits of piers, but we think they should in no event be construed as fixing the inner harbor line, which when established becomes the outer shore land boundary.

Counsel for the defendants have learnedly discussed at great length, and reviewed many authorities, touching the doctrine of *jus publicum* as applied to the state's ownership and dominion over shore lands and lands under navigable waters bordering thereon, with a view of demonstrating want of power in the state, or rather its constituted authorities, to vest in absolute private ownership these added shore lands. As we view the problem here presented, however, it is not so much a question of the power of the state to vest in private ownership the lands or harbor areas here involved, but it is a question of where, upon the ground, is the line between shore lands which the state has the power to vest in private ownership, and harbor areas and other lands under navigable water which cannot be so disposed of. Our holding here is, and we need go no farther, that the state has the power to determine where the line dividing these two classes of lands shall be located upon the ground, and has lawfully done so in so far as it has established the harbor areas designated upon the state's plat made by its commissioner of public lands and harbor line commission.

We have proceeded upon the assumption, as already stated, that all of the attempted reservations to public use of tracts and areas designated upon the state's plats are from lands outside the shore lands as they existed at the time of the execution of the state's deeds upon which the plaintiffs' rights are rested. If we are wrong in this assumption of fact, it is of no material consequence in this controversy, since, from what we have said, we think it is rendered plain that the rights of the plaintiffs in the shore lands, as those lands existed at the time of the execution of the state's deeds, are no less than their rights to the added shore lands, and that both the original and added shore lands are held by the state's grantees subject to the power of the state to establish harbor lines, and thereby define the outer boundaries of the shore lands.

We conclude that the decree of the superior court should be modified in its terms only so far as to render certain that it will not constitute an adjudication estopping the state from exercising its power to establish harbor lines and harbor areas in front of the plaintiffs' shore lands where no harbor lines or harbor areas are now established, and thus define the outer boundaries of such shore lands, and that in all other respects the decree should be affirmed. It is so ordered, and the superior court is directed to modify and make certain the decree accordingly. None of the parties will recover costs in this court.

MORRIS, C. J., HOLCOMB, ELLIS, FULLERTON, MOUNT, and MAIN, JJ., concur.

CHADWICK, J. (concurring)—The use of the words "pierhead line" on the plat prepared by the state, and in the decree, is an unfortunate misuse of terms. The words mean nothing under our constitution and statutes. In some of the eastern states, we understand that "pierhead lines" are defined, but the constitution makers in this state were careful to avoid the confusion that may result from the drawing of

an arbitrary line beyond which piers and docks should not be erected, by providing for an inner and an outer harbor line with an intervening area subject to state ownership and control.

It may be that the commissioner of public lands and the harbor line commission intended the line so designated to be the outer harbor line, subject, of course, to the approval of the war department, for, under our law, piers or wharves could be built in the harbor area between the inner and the outer harbor line, and in that sense, if there be no further limitation, the outer harbor line is a "pierhead line." But I agree that we should not assume anything against the future right of the state to define, in terms, that which it has reserved—the right to fix an inner and an outer harbor line. Treating the words "pierhead line" as without legal meaning under our statutes, the conclusion follows as indicated by Judge Parker.

I deem it my duty to suggest that the commissioner of public lands should, without delay, file an amended plat, fixing the harbor lines in Lake Washington in front of the city of Seattle. Until this is done, there will be a confusion of interests, with no way of determining legal rights.

I do not want to be understood as holding that the legislature could not provide for the drawing of a "pierhead line" between the inner harbor line and the outer harbor line, either through the instrumentality of the harbor line commission, the commissioner of public lands, a harbor commissioner or port warden, or by an independent board. What I do hold is that it cannot be done in any event until the harbor lines are established.